JUDGE PAULEY    10 CV 9458

Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, P.C.
450 7th Avenue, Suite 2601
New York, New York 10123
212-425-2600
*Attorneys for Plaintiff*

RECEIVED DEC 20 2010 U.S.D.C. S.D.N.Y. COMPLETED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

LEE KRAMSKY,

            Plaintiff,

   -against-

CHETRIT GROUP, LLC,

            Defendant.
-----------------------------------------------------------X

Civ. No.:

**COMPLAINT**

Plaintiff, LES KRAMSKY, by his attorneys, THE HARMAN FIRM, P.C., as and for his Complaint against Defendant alleges as follows:

## PARTIES, JURISDICTION AND NATURE OF ACTION

1. Plaintiff, LES KRAMSKY ("KRAMSKY"), a citizen of the State of New Jersey, was subjected to a religiously offensive hostile work environment and was then unlawfully terminated from his employment solely because of his religion in violation of Title VII of the Civil Rights Act of 1964.

2. Upon information and belief, CHETRIT GROUP, LLC ("CHETRIT"), the defendant herein, at all times hereinafter mentioned, is a corporation authorized to do business in New York, with offices located at 404 5th Avenue, New York, New York 10018.

3. Plaintiff KRAMSKY filed a timely charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") on or about July 1, 2010, complaining of the acts of discrimination alleged herein.

4. On or about November 29, 2010, the EEOC issued a notice informing Plaintiff KRAMSKY of his right to sue Defendant in federal court. This action has been commenced within 90 days of receipt of this notice. Plaintiff KRAMSKY has complied fully with all prerequisites for jurisdiction in this Court under Title VII.

5. This action seeks damages for Defendant's violations of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII").

6. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 626(c), and 28 U.S.C. §§ 1331 and 1343.

7. Venue is properly laid in the Southern District of New York under U.S.C. § 1391(b), in that this is the District in which the majority of the unlawful practices occurred.

## JURY DEMAND

8. Plaintiff KRAMSKY respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## BACKGROUND

9. Plaintiff KRAMSKY is an extremely capable and successful real estate attorney, who had his own practice for over eighteen (18) years. Upon the promises and representations made by Defendant CHETRIT, Plaintiff KRAMSKY gave up his lucrative practice to become General Counsel for Defendant CHETRIT.

10. Defendant CHETRIT is a multi-million dollar real estate company, based in New York City. Defendant CHETRIT owns a number of buildings in and around New York City and all over the United States, including owning a significant portion of the Sears Tower in Chicago.

## **RELIGIOUS DISCRIMINATION**

11. On or about April 20, 2009, Plaintiff KRAMSKY began working for Defendant CHETRIT as General Counsel, with an annual salary of $150,000.00 and a promised bonus of $30,000.00.

12. However, the discrimination actually began on or about February 17, 2009, during his initial interview with Judah Chetrit and Jacob Chetrit, partners of Defendant CHETRIT.

13. During this interview, Plaintiff KRAMSKY mentioned that he was looking forward to his son's Bar Mitzvah, which was coming up soon.

14. Joseph Chetrit then mentioned in Hebrew to Jacob Chetrit that Plaintiff KRAMSKY was Jewish.

15. Upon information and belief, Joseph Chetrit and Jacob Chetrit hired Plaintiff KRAMSKY because they believed that Plaintiff KRAMSKY was an Orthodox Jew.

16. Soon after Plaintiff KRAMSKY commenced his employment on or about April 20, 2009, Simon Chetrit, the father of Joseph and Jacob, came into Plaintiff KRAMSKY's office and asked if he spoke Hebrew. After Plaintiff KRAMSKY advised him that he did not, Simon Chetrit never spoke to Plaintiff KRAMSKY again, solely due to the fact that he was not an Orthodox Jew and did not speak Hebrew.

17. In or about June 2009, Plaintiff KRAMSKY was asked by Meyer Chetrit, another partner, what temple he belonged to and whether it was an Orthodox temple. Plaintiff

KRAMSKY gave him the name of his temple and stated that it was not an Orthodox temple. Meyer Chetrit then asked if the men and women sit together or separately. Plaintiff KRAMSKY advised him that the men and women do sit together because it is not an Orthodox temple.

18. Once it was discovered that Plaintiff KRAMSKY was not Orthodox, the partners of Defendant CHETRIT immediately began to treat him differently. Certain work, projects and assignments that were normally assigned to Plaintiff KRAMSKY were now sent to outside, Orthodox Jewish counsel. Even simple real estate matters were no longer being assigned to Plaintiff KRAMSKY.

19. Moreover, Plaintiff KRAMSKY was no longer included in any meetings since Plaintiff KRAMSKY was not part of their Orthodox Jewish community.

20. In addition, once the partners of Defendant CHETRIT learned that he was not an Orthodox Jew, they never again trusted Plaintiff KRAMSKY with blank checks or powers of attorney, both of which are required when a client or buyer is not appearing at a real estate closing.

21. For example, in or about September 2009, Plaintiff KRAMSKY requested blank checks and a power of attorney from Meyer Chetrit, as Mr. Chetrit was not attending a closing. For no reason at all, Meyer Chetrit simply refused to provide Plaintiff KRAMSKY with the blank checks and power of attorney.

22. At this time, Plaintiff KRAMSKY reminded Meyer Chetrit that throughout his twenty (20) years of practicing real estate law, his clients had always given him blank checks and powers of attorney to bring to real estate closings.

23. Furthermore, solely due to the fact that he was not an Orthodox Jew, Plaintiff KRAMSKY was always second-guessed on decisions he made, while the Orthodox Jewish

4

investors, outside Orthodox attorneys, and the Orthodox employees were always trusted with routine business-related decisions.

24. In addition, Defendant CHETRIT always had Plaintiff KRAMSKY's legal work reviewed and revised by non-attorneys that were all Orthodox.

25. This was rather strange, as Plaintiff KRAMSKY never received any complaints with respect to his legal work performance. Plaintiff KRAMSKY strongly believes that he was discriminated against, and treated differently, solely because he was not Orthodox.

26. In another instance, on or about August 5, 2009, after Plaintiff KRAMSKY prepared security instruments for a private loan which were agreed to by opposing counsel, Joseph Chetrit decided, in his lay person's opinion, that the documents were not detailed enough and decided to add language that did not make sense to Plaintiff KRAMSKY from a legal perspective.

27. Joseph Chetrit then gave the prepared documents to Defendant CHETRIT's Orthodox outside counsel to review, making it appear that Plaintiff KRAMSKY had made the additions. Not surprisingly, the Orthodox attorney deleted all of the items that Mr. Chetrit had added.

28. This incident was very embarrassing to Plaintiff KRAMSKY, as the documents that he prepared were perfect and already agreed to by all parties involved.

29. Upon information and belief, Joseph Chetrit had no confidence in Plaintiff KRAMSKY's legal ability solely because he was not Orthodox Jewish. This is evidenced by Joseph Chetrit's and Meyer Chetrit's continual insistence that all work be checked by their Orthodox legal counsel.

30. In or about November 2009, Defendant CHETRIT had assembled a meeting of all

5

Orthodox parties. Whenever the group did not want Plaintiff KRAMSKY to understand something, they would switch from English to Hebrew. This made Plaintiff KRAMSKY feel like he was being treated differently because he was not Orthodox and did not speak Hebrew.

31. Whenever Plaintiff KRAMSKY advised Defendant CHETRIT on a legal issue, Defendant CHETRIT would always double check with their Orthodox outside counsel even though Plaintiff KRAMSKY's advice was always correct. This caused Plaintiff KRAMSKY again to feel like he was being treated differently simply because he was not Orthodox Jewish.

32. Upon information and belief, the only parties trusted by the partners of Defendant CHETRIT are Orthodox Jewish, including their two main project managers, a high level office person, real estate outside counsel, an outside accountant, the main contractor, an insurance person, and all of the investor partners.

33. In addition, Defendant CHETRIT regularly had an Orthodox Rabbi come to their office during working hours. Every time the Rabbi saw Plaintiff KRAMSKY, he requested that Plaintiff KRAMSKY put on tefillin, an Orthodox Jewish ritual. Plaintiff KRAMSKY continually advised the Rabbi that he was not Orthodox and was not comfortable practicing his religion in the office. Nevertheless, the Rabbi would always ask Plaintiff KRAMSKY to put on tefillin and pray, making him feel very uncomfortable. The Rabbi did not do this to any of the Orthodox Jewish people in the office.

34. Plaintiff KRAMSKY found himself constantly at odds with Defendant CHETRIT as a result of him not practicing Orthodox Judaism like the rest of Defendant CHETRIT's owners and key employees.

35. Plaintiff KRAMSKY's religion became a source of contention between himself and Defendant CHETRIT, and eventually led to his unlawful termination from Defendant

6

CHETRIT.

36. On or about January 22, 2010, Joseph Chetrit called Plaintiff KRAMSKY into his office and told Plaintiff KRAMSKY that his employment with Defendant CHETRIT was terminated.

37. Upon information and belief, Defendant CHETRIT terminated Plaintiff KRAMSKY's employment solely due to his religion.

38. Defendant CHETRIT's blatant discrimination has humiliated Plaintiff KRAMSKY, causing him much emotional distress.

39. Upon information and belief, Defendant CHETRIT knew that its actions violated Federal civil rights laws.

40. Upon information and belief, Defendant CHETRIT's actions were done maliciously and/or in reckless disregard for Plaintiff KRAMSKY's civil rights.

## FIRST CAUSE OF ACTION
[Title VII – Religious Discrimination]

41. Plaintiff KRAMSKY repeats and realleges each and every allegation contained in paragraphs "1" though "40" with the same force and affect as if separately alleged and reiterated herein.

42. By the acts and practices described above, including but not limited to, subjecting Plaintiff KRAMSKY to a hostile work environment as well as terminating his employment, Defendant CHETRIT discriminated against Plaintiff in the terms and conditions of his employment on the basis of his religion in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII").

43. As a result, Plaintiff KRAMSKY is now suffering and will continue to suffer irreparable physical and mental injuries and monetary damages and damages for physical and mental anguish and humiliation because of the discriminatory conduct of Defendant CHETRIT.

44. Defendant CHETRIT's discriminatory conduct towards Plaintiff KRAMSKY constitutes a malicious, willful and reckless violation of Plaintiff's rights under Title VII.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

(i) On the First Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(ii) Disbursements and other costs;

(iii) Attorneys' fees; and

(iv) For such other and further relief which the Court deems just and proper.

Dated: New York, New York
December 20, 2010

By: _____
Walker G. Harman, Jr., Esq. [WH-8044]
THE HARMAN FIRM, P.C.
*Attorneys for Plaintiff*
450 7th Avenue, Suite 2601
New York, New York 10123
212-425-2600